IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAMES ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 08-808-SLR |
| | ) | |
| FREDERICK FORD MERCURY INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

Maggie Ruth Clausell, Esquire of Maggie Ruth Clausell at Law, Dover, Delaware.
Counsel for Plaintiff.

George Thomas Lees, III, Esquire of Rawle & Henderson LLP, Wilmington, Delaware.
Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated:  March 17, 2010
Wilmington, Delaware

*[signature]*
ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff James Anderson ("plaintiff") filed a complaint against defendant Frederick Ford Mercury, Inc. ("defendant"), alleging that defendant engaged in unlawful conduct during the course of a retail car transaction. More specifically, plaintiff contends that defendant's conduct violated: (1) the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq. (count IX); (2) the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 et seq. (count II); (3) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq. (count IV); and (4) Regulation B of the Federal Reserve Board ("Regulation B"), 12 C.F.R. Part 202 (count III). Plaintiff also asserts state and common law claims relating to the transaction, including: (1) wrongful possession, pursuant to 6 Del. C. § 9-609 (count V); (2) violation of 6 Del. C. § 9-611 for failure to notify (count VI); (3) breach of contract (count I); (4) conversion (count VII); (5) fraud (count VIII); and (consumer fraud) (count X). Plaintiff seeks judgment against defendant for actual and punitive damages, as well as compensatory damages for, e.g., emotional pain, suffering, humiliation and embarrassment. (D.I. 1)

At the conclusion of discovery, defendant timely moved for entry of a summary judgment. Plaintiff has responded. The court has jurisdiction over the case pursuant to 28 U.S.C. § 1331. For the reasons that follow, defendant's motion shall be granted as to counts II, III, IV and IX. The remainder of the complaint shall be dismissed.

## II. BACKGROUND

Plaintiff is an individual living in Milford, Delaware. Defendant is a Delaware corporation doing business in Seaford, Delaware. Defendant is in the business of

selling cars, including used cars.  For purposes of this motion, plaintiff was a consumer

in the market for a used car at all relevant times.

On or about April 17, 2008, plaintiff purchased a used 1999 Pontiac Montana

(the "Montana") from an auto auction for approximately $2,350.  By April 21, 2008,

plaintiff (through a friend) had contacted defendant telephonically to inquire about

purchasing another used car.  Starting on April 21, 2008, multiple credit inquiries are

recorded on plaintiff's credit report, including inquiries by defendant.  (D.I. 55 at ex. I)

Plaintiff electronically completed a credit application with defendant on April 25, 2008.

Prior to April 2008, plaintiff had purchased three vehicles from defendant; plaintiff

understood that financing for these vehicles was placed with third parties.  (D.I. 51 at A5

and A9; D.I. 157 at A83, A85–87)

On April 28, 2008, plaintiff appeared at the Frederick Ford Seaford dealership in

order to buy a 2005 Chrysler Town & Country van, VIN number 2C4GP44R75R171285

("the van").  Plaintiff was prepared to trade in the Montana toward the purchase price of

the van; the trade-in was later characterized in the paperwork as a "down payment"

valued at $2,500.  In connection with these discussions, plaintiff signed the following

documents on April 28, 2008:  (1) a "Retail Order for a Motor Vehicle ("Buyer's Order

#1");" (D.I. 51 at A10); (2) a Retail Installment Sales Contract ("RISC #1") (*id.* at A12-

15); and (3) a Dealer Tag Overnight Approval Form (*id.* at A16).

Buyer Order #1 was not signed by a representative of defendant.  In this regard,

the document provided:  "THIS ORDER IS NOT VALID UNLESS SIGNED AND

ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE."  (*Id.* at A10)

Buyer Order #1 included the following additional information:  (1) a selling price of

2

$12,500; (2) amount financed of $10,509; (3) through "Regional Acceptance Corp.;" (4) 66 payments; (5) of $276.33 per month; (6) representing a 22% APR.[1]  (*Id; see also* D.I. 55, ex. A at 2)

RISC #1 provided that, by signing, the buyer had chosen to buy a vehicle "on credit under the terms" described in the "Federal Truth-in-Lending Disclosures," which credit terms included the following:  (1) total sales price of $20,737.78 (including the $2,500 down payment); (2) amount financed of $10, 509; (3) at 22% APR; (4) over 66 months; (5) payments of $276.33 per month; (6) beginning June 1, 2008.  (D.I. 51 at A12)  RISC #1 further calculated the total finance charge to be $7,728.78, with the payments totaling $18,237.78.  (*Id.*)  RISC #1 was signed by plaintiff; instead of a signature, "Frederick Ford/Mercury Inc." was stamped in the line "Seller(Creditor) Signs."  (*Id.*)  RISC #1 provided, in the "Who is Bound" paragraph, that the "'we,' 'us,' and 'our' mean [Frederick Ford/Mercury Inc.] and, **after assignment and acceptance,** the Seller's assignee, JP Morgan Chase Bank, N.A., acting on its own or as agent for an affiliated entity (and any subsequent assignee)."  (*Id.*) (emphasis added)  RISC #1 appears to be a Chase document.

By executing the Dealer Tag Overnight Approval Form on April 28, 2008, plaintiff acknowledged that, "upon the event that the **buyer or seller cannot obtain financing** on the above referenced vehicle, . . . the buyer will return the vehicle and dealer tag to Frederick Ford-Mercury within 24 hours after the buyer has been notified that financing is not able to be obtained. . . .  Any vehicle or dealer tag not returned within 24 hours

---

[1]"APR" is the annual percentage rate of interest.

after notification will be considered stolen and the proper authorities will be notified."
(*Id.* at A16) (emphasis added)

Plaintiff apparently took possession of the van on April 28th and returned to defendant's place of business the following day, April 29, 2008, in order to pick up the temporary tag and to sign over title to the Montana. According to plaintiff, he was asked to sign a second "Retail Order for a Motor Vehicle" ("Buyer Order #2) and a second Retail Installment Sales Contract ("RISC #2") for the van, which documents were backdated April 28, 2008. (D.I. 51 at A21-26) Buyer Order #2 included the following information: (1) a selling price of $10,788.73; (2) amount financed of $9,311.73; (3) through Wilmington Trust Company; (4) 63 payments; (5) of $236.21 per month; (6) representing a 19.30% APR. (*Id.* at A21) Buyer Order #2 was signed by plaintiff, but not by any representative of defendant; it contains the same language regarding its validity as did Buyer Order #1.

RISC #2 appears to be a Wilmington Trust document that included the following "Federal Truth-in-Lending Disclosures:" (1) total sales price of $17,381.23 (including the $2,500 down payment); (2) amount financed of $9,311; (3) at a 19.3% APR; (4) over 63 months; (5) payments of $236.21 per month; (6) beginning May 28, 2008. (*Id.* at A23) RISC #2 further calculated the total finance charge to be $5,569.50, with the payments totaling $14,881.23. (*Id.* at A23) Although signed by plaintiff, RISC #2 is only stamped "Frederick Ford/Mercury Inc." as the "Seller." (*Id.* at A24)

Plaintiff received a temporary tag dated April 28, 2008. (D.I. 55 at A6) On April 30, 2008, he obtained automobile insurance on the van, effective April 29, 2008. (*Id.* at

4

A2) From the period of April 29, 2008 until at least May 9, 2008, plaintiff had full use of the van without incident.

On or about May 12, 2008, plaintiff was informed by a representative of defendant that he needed to return the van.  Plaintiff refused.  On or about May 15, 2008, plaintiff was informed that he had not obtained financing and that he was required to return the van as a result.  (D.I. 55 at 7-8)  According to plaintiff, as of May 29, 2008, he had not been notified that his application for financing had been denied by the creditors involved.  (D.I. 55 aat 9)  The van was repossessed on or about June 14, 2008.

Plaintiff submitted a credit report as an exhibit to his responsive brief.  According to the report:  (1) on April 21, 2008, defendant, Regional Acceptance Corporation, Chase, and CapitalOne Auto Finance made credit inquiries; (2) on April 25, 2008, defendant, Regional Acceptance Corporation, CapitalOne Auto Finance, AmeriCredit, Wells Fargo Auto Finance, Inc., and HSBC Auto Finance made credit inquiries; and (3) on April 29 2008, defendant, Wilmington Trust Company, CapitalOne Auto Finance, HSBC Auto Finance, and Ford Motor Credit Company made credit inquiries.  (D.I. 55, ex. I)  In a letter to plaintiff dated May 18, 2008, Regional Acceptance Corporation declined to extend credit based on plaintiff's "high debt/income ratio."  (D.I. 51 at A20)  Chase addressed a letter to plaintiff dated May 20, 2008 declining his request for credit and offering to provide more specific details about the declination upon request.  (*Id.* at A33-36)  Wilmington Trust Company addressed a letter to plaintiff dated April 29, 2008 declining to extend plaintiff credit, based on his "delinquent past or present credit obligations with others."  (*Id.* at A37)  Similar letters rejecting an extension of credit to

5

plaintiff include those from Wells Fargo Auto Finance, Inc. dated May 4, 2008 (*id.* at A38), AmeriCredit dated May 13, 2008 (*id.* at A39-A40), Ford Motor Credit Company (*id.* at A41), HSBC Auto Finance dated May 20 and May 22, 2008 (*id.* at A42-A47), and CapitalOne Auto Finance dated May 3, 2008 (*id.* at A48-A51).

The record does not clearly indicate when, why or by whom these creditors were approached in connection with the transaction at bar.[2]  Nevertheless, there is no evidence of record to demonstrate that defendant, as opposed to the above creditors, was going to finance the sale, or that plaintiff was creditworthy.[3]

In his complaint, plaintiff generally characterizes the facts and circumstances recited above as "an increasingly common practice in the retail sales industry called 'spot delivery' or a 'yo-yo sale.'"  (D.I. 1 at 1)  According to plaintiff,

> [u]sing this practice, the dealer sells an automobile to the consumer "on the spot," but intends to string the customer out like a yo-yo, and then yank them back to force them into an agreement on different terms.  Typically, the consumer signs all the paperwork, receives a certificate of ownership, temporary or transferred tags, and possession of the automobile.  The dealer represents to the consumer that everything is approved.  The consumer leaves the dealership believing they own the automobile.  The sale is financed by the dealer (as the creditor) on a Retail Installment Sales Contract which the dealer states

---

[2]Although exhibit I indicates that defendant and CapitalOne Auto Finance made credit inquiries on May 19, 2008, plaintiff has provided no evidence that these inquiries were related to the transaction at issue.  Therefore, the court declines to address these credit inquiries further, especially since plaintiff failed to produce exhibit I during discovery.  (D.I. 156 at 1-2; D.I. 157 at A75-A81)

[3]The court notes that, although there are several credit reports of record relating to plaintiff (*see* D.I. 51 at A17-19; D.I. 55, ex. I), plaintiff has not obtained any expert evidence demonstrating either that he was creditworthy or that "[e]ach [credit] inquiry reduces the credit score" (D.I. 55 at 9) and, therefore, somehow affected his ability to get credit.

6

will be, or has already been, assigned to a third pary.  As in the present case, the dealer knows that the contract cannot be sold to the third party, that the third party has refused to purchase it, and that it will require the consumer to agree to more adverse terms to keep the car.  Many consumers simply agree to the terms.  A few, such as the plaintiff, object.

(*Id.*)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough

7

evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Despite the potential for fraudulent abuse of spot delivery transactions in a "yo-yo" sales scheme, the court starts from the premise that, "absent some independent showing of fraud or misrepresentation, spot delivery transactions are not illegal." *Rucker v. Sheehy Alexandria, Inc.*, 278 F. Supp. 2d 711, 719 (E.D. Va. 2002). The court in *Rucker* described a spot delivery transaction as follows:

> In a spot delivery transaction, the buyer takes possession of the
> vehicle pursuant to financing terms which have been agreed upon
> by the parties, but not yet accepted by a third party lender. In the
> event the lender rejects the financing terms, the agreement between
> the buyer and the seller is null and void. A spot delivery sale is used
> to allow the buyer to take possession of the car before the financing
> is approved.

*Id.* at 713 n.1. According to the court in *Rucker*, the documents in that case "made clear that [the transaction] was a spot delivery, because the sale was conditioned upon financing being obtained from a third party lender according to the terms of the RISC within five days from the date of the agreements." *Id.* at 713. The issue in *Rucker* was a narrow one, "whether the disclosures in the second agreement violate[d] the Truth in Lending Act . . . by calculating the annual percentage rate of interest (APR) on the basis of the date on the backdated agreement rather than the date the transaction

8

was consummated." *Id.*

With this background in mind, the court will address defendant's motion consistent with the record presented by the parties.

### A. Federal Statutory Claims

Each of the three federal statutes asserted in the complaint is directed to a different aspect of the regulation of credit transactions.

#### 1. TILA

The TILA was enacted in order "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Vallies v. Sky Bank*, 432 F.3d 493, 495 (3d Cir. 2006) (citing *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 389 (3d Cir. 2002)). *See* 15 U.S.C. § 1601(a). The TILA requires creditors "to make certain prominent disclosures when extending credit, including the amount financed, all finance charges, and the APR." *Rucker*, 238 F. Supp. 2d at 716. The term "creditor" under the TILA has been interpreted to include those persons who "arrange for" credit, such as automobile dealers that arrange financing for buyers with finance companies. *See, e.g., Whitlock v. Midwest Acceptance Corp.*, 575 F.2d 652 (8th Cir. 1978); *Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F. Supp. 1406 (D. Conn. 1988). Defendant does not dispute that it is a "creditor" subject to the provisions of the TILA.

Plaintiff's claim under the TILA is limited to his assertion that he is entitled to

9

statutory damages under 15 U.S.C. § 1640(a)(4), based on defendant's alleged failure "to disclose the correct APR and financing charges after [it] backdated the contract[, i.e., RISC #2]." (D.I. 55 at 25)  More specifically, plaintiff claims as statutory damages[4] the difference between the interest payable from April 29, 2008 forward (the date he executed RISC #2) and the interest payable from April 28, 2008 forward (the date that appears on RISC #2).  (*Id.*)

Section 1640(a)(4) provides for damages "in the case of a failure to comply with any requirement under section 1639 of this title, [in] an amount equal to the sum of all **finance charges** and fees **paid by the consumer** . . . ." (emphasis added)  Plaintiff cites no authority for the award of statutory damages when the consumer has paid no finance charges associated with the APR.  *See, e.g., Rucker*, 228 F. Supp. 2d at 716 (the second agreement "is the surviving agreement by which the parties remain bound and according to which Rucker has continued to make her payments due on the loan.").

The court declines to award statutory damages under the TILA in circumstances where, as here, plaintiff was never obligated to pay any finance charges related to the purchase of the van.[5]  Therefore, defendant's motion for entry of a summary judgment

---

[4]Plaintiff does not claim actual damages.

[5]The court is cognizant of the case authority finding that a transaction, deemed consummated under the TILA and Regulation Z when the consumer becomes contractually obligated on a credit transaction, can encompass unfunded financing agreements. *See, e.g., Nigh v. Koons Buick Pontiac GMC, Inc.*, 319 F.3d 119, 124 (4th Cir. 2003).  Nevertheless, as noted above, the very transaction described by plaintiff in his complaint (the "yo-yo sales scheme") contemplates a transaction where both parties are bound.  Moreover, it is apparent that the terms of RISC #2 were more favorable than those of RISC #1.  (D.I. 56 at 3)  It would be nonsensical to award damages to plaintiff under these circumstances.

10

is granted with respect to count IX.

### 2. ECOP

The ECOP makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a).[6] Plaintiff does not allege such discrimination. (D.I. 55 at 17) Rather, he asserts that defendant violated the procedural notification requirements found in 15 U.S.C. § 1691(d)[7] and Regulation B, 12 C.F.R. § 202.9, when it failed to send him "an adverse action notice as required by law." (Id.)

Even assuming that these notification requirements can be triggered in the absence of discrimination, § 1691(d)(4) precludes a finding of liability against defendant. That section provides that, "[w]here a creditor has been requested by a third party to make a specific extension of credit directly or indirectly to an applicant, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly through the third party, provided in either case that the identity of the creditor is disclosed." This requirement has been met. (D.I. 51 at A20, A33-51) See generally, Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971, 975 (7th Cir. 2004); Thele v. Sunrise Chevrolet, Inc., 2004 WL 1194751, at *7

---

[6]Regulation B was issued by the Board of Governors of the Federal Reserve System pursuant to the ECOP, with the same purpose of promoting "the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1.

[7]Although plaintiff refers to § 1691(c) ("Additional activities not constituting discrimination"), the court believes the proper citation is to subsection (d) ("Reason for adverse action").

11

(N.D. Ill. 2004). Therefore, plaintiff has failed to raise genuine issues of material fact as to his claims under the ECOP and Regulation B; defendant is entitled to judgment as a matter of law as to counts II and III.

### 3. FCRA

The FCRA was enacted by Congress "'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Gelman v. State Farm Mutual Automoblie Insurance* Co., 583 F.3d 187, 191 (3d Cir. 2009) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 127 S. Ct. 2201, 2205 (2007)). In order to ensure that "'consumer reporting agencies[8] exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer,'" *Gelman*, 583 F.3d at 191 (citing 15 U.S.C. § 1681(a)(4)), the FCRA prohibits "'credit agencies from releasing consumer credit reports[9] 'unless the release occurs for one of the permissible purposes set forth in 15 U.S.C. § 1681b(a).'" *Id.* (citing *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 727 (7th Cir. 2004)).

---

[8]A "consumer reporting agency" is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

[9]"A 'consumer credit report' is 'any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for: (A) credit or insurance to be used primarily for personal, family or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.' 15 U.S.C. § 1681a(d)(1)." *Id.* at 191 n.6.

Plaintiff seeks damages under FCRA pursuant to 15 U.S.C. §§ 1681n and

1681o, which generally provide that any "person" who negligently or willfully "fails to

comply with any requirement imposed under [FCRA] with respect to any consumer is

liable to that consumer." *Id.* The only violation of FCRA asserted by plaintiff is that

related to his allegation that defendant "accessed" his credit report without authorization

after April 28, 2008,[10] in violation of 15 U.S.C. § 1681b(a)(3)(A). Section 1681b(a)(3)(A)

provides that

> any consumer reporting agency may furnish a consumer report . . .
> [t]o a person which it has reason to believe—intends to use the
> information in connection with a credit transaction involving the
> consumer on whom the information is to be furnished and involving
> the extension of credit to, or review or collection of an account of,
> the consumer. . . .

Among the permissible purposes for disclosure of a consumer's credit information is

"when the consumer applies for credit" or "when a credit or insurance provider is

extending the consumer a 'firm offer of credit or insurance.'" *Gelman*, 583 F.3d at 191

(citing 15 U.S.C. § 1681b(c)(1)(B)(I)).[11]

Plaintiff has offered neither evidence nor argument to flesh out his FCRA claim.

---

[10]More specifically, plaintiff asserts that defendant "made, or caused to be made, eleven (11) post April 28, 2008 inquiries on plaintiff's credit report." (D.I. 55 at 20) As noted above, however, the summary judgment record provided by the parties indicates that: (1) five, not eleven, credit inquiries ostensibly related to this transaction were made after April 28, 2008; (2) these five inquiries were made on April 29, 2008, when plaintiff was still actively engaged in the transaction; and (3) Wilmington Trust Company, the one creditor plaintiff attempted to pay, made its credit inquiry on April 29, 2008.

[11]*See also* 15 U.S.C. § 15 U.S.C. § 1681a(l) and *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719, 723 (7th Cir. 2008), for a discussion of "firm offer of credit".

13

The factual underpinning of the claim is that he "instructed defendant to refrain from causing any additional credit inquiries" on April 28, 2008. This allegation is contained in the complaint (D.I. 1, ¶ 44), but not in his deposition or in any other evidence of record. (D.I. 157 at A91) Indeed, it is clear from the record that plaintiff initiated the transaction and authorized credit inquiries as early as April 21, 2008 and was still engaged in the transaction as late as April 29, 2008. Therefore, plaintiff has raised no genuine issues of material fact as to whether the credit inquiries were made in connection with his credit application. Although the number of credit inquiries associated with this transaction (including defendant's) seem high, the facts of record do not support the legal claims as structured. Consequently, defendant's motion for summary judgment shall be granted as to count IV.

## B. State and Common Law Claims

Plaintiff raises a number of state and common law claims. Because the court has disposed of all of the federal claims over which it had original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining claims, pursuant to 28 U.S.C. § 1367(c)(3). *See generally, Eubanks v. Gerwen,* 40 F.3d 1157, 1162 (11th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988) (comity suggests that, with respect to the early disposal of federal claims, any remaining state law claim should be heard in state court if plaintiff desires to press it)).[12]

## V. CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted as

---

[12]It is the court's understanding that none of these claims would be barred by an applicable statute of limitations.

14

to counts II, III, IV and IX of the complaint.  The court declines to exercise supplemental jurisdiction over the remaining state and common law claims (counts I, V, VI, VII, VIII and X); therefore, the complaint is dismissed as to these counts.  An order shall issue.

15